Note 11 – Incentive Stock Programs

Abbott measures compensation cost using the intrinsic value–based method of accounting for stock options and replacement stock options granted to employees. Had compensation cost been determined using a fair market value–based accounting method, pro forma net earnings (*in millions*) and earnings per share (EPS) amounts would have been as shown in the table below. Effective in the first quarter 2005, the calculation of pro forma compensation expense was modified to reflect a shorter vesting period for employees who are retirement eligible or who will be retirement eligible during the normal vesting period. Approximately 40 to 45 percent of the annual net cost of stock options granted will typically be recognized in the first quarter due to the timing of stock option grants. The effect of this change has an immaterial effect on the annual pro forma compensation expense. The quarterly pro forma compensation cost and EPS amounts for 2004 have been adjusted to reflect this change.

|  | Three Months Ended June 30 | | Six Months Ended June 30 | |
|---|---|---|---|---|
|  | 2005 | 2004 | 2005 | 2004 |
| Net earnings, as reported | $ 877 | $ 634 | $ 1,715 | $ 1,457 |
| Compensation cost under fair value–based accounting method, net of taxes | (45) | (40) | (135) | (124) |
| Net earnings, pro forma | $ 832 | $ 594 | $ 1,580 | $ 1,333 |
| Diluted EPS from continuing operations, as reported | $ 0.56 | $ 0.40 | $ 1.09 | $ 0.89 |
| Diluted EPS from continuing operations, pro forma | 0.53 | 0.38 | 1.01 | 0.81 |
| Basic EPS, as reported | 0.56 | 0.41 | 1.10 | 0.93 |
| Basic EPS, pro forma | 0.54 | 0.38 | 1.02 | 0.85 |
| Diluted EPS, as reported | 0.56 | 0.40 | 1.09 | 0.93 |
| Diluted EPS, pro forma | 0.53 | 0.38 | 1.01 | 0.85 |

The above information was derived using Statement of Financial Accounting Standards (SFAS) No. 123 and the Black–Scholes valuation model. In December 2004, the Financial Accounting Standards Board issued SFAS No. 123 (revised 2004), "Share–Based Payment." This standard required companies to expense employee stock options beginning no later than July 1, 2005. On April 14, 2005, the Securities and Exchange Commission announced that companies may implement SFAS No. 123 (revised 2004) at the beginning of their next fiscal year that begins after June 15, 2005. Abbott expects to adopt the revised rules on January 1, 2006.

Note 12 – Equity Method Investments
*(dollars in millions)*

Abbott's 50 percent–owned joint venture, TAP Pharmaceutical Products Inc. (TAP), is accounted for under the equity method of accounting. Summarized financial information for TAP is as follows:

|  | Three Months Ended June 30 | | Six Months Ended June 30 | |
| --- | ---: | ---: | ---: | ---: |
|  | 2005 | 2004 | 2005 | 2004 |
| Net sales | $ 841.2 | $ 908.6 | $ 1,601.9 | $ 1,767.7 |
| Cost of sales | 237.2 | 258.3 | 460.0 | 506.4 |
| Income before taxes | 337.5 | 378.7 | 598.4 | 698.9 |
| Net earnings | 214.3 | 240.5 | 380.0 | 443.8 |

|  | June 30 2005 | December 31 2004 |
| --- | ---: | ---: |
| Current assets | $ 1,275.5 | $ 951.7 |
| Total assets | 1,423.4 | 1,176.6 |
| Current liabilities | 1,145.1 | 976.8 |
| Total liabilities | 1,199.4 | 1,025.2 |

Note 13 – Goodwill and Intangible Assets
*(dollars in millions)*

Abbott recorded goodwill of approximately $834 related to the acquisitions of TheraSense in the second quarter of 2004 and i–STAT in the first quarter of 2004. Foreign currency translation adjustments (decreased) increased goodwill in the first six months of 2005 and 2004 by approximately ($232) and $62, respectively. There were no reductions of goodwill relating to impairments or disposal of all or a portion of a business.

The gross amount of amortizable intangible assets, primarily product rights and technology, was $6,563 as of June 30, 2005 and $6,622 as of December 31, 2004, and accumulated amortization was $1,734 as of June 30, 2005 and $1,468 as of December 31, 2004. Intangible assets with indefinite lives are not significant. The estimated annual amortization expense for intangible assets is $484 in 2005, $485 in 2006, $468 in 2007, $445 in 2008, and $439 in 2009. Intangible assets are amortized primarily on a straight–line basis over 4 to 25 years (average 13 years).

11

## FINANCIAL REVIEW

### Results of Operations

The following table details sales by reportable segment for the second quarter and first six months:
*(dollars in millions)*

|  | Three Months Ended June 30 | | | Six Months Ended June 30 | | |
|---|---|---|---|---|---|---|
|  | Net Sales to External Customers | | Percentage Change (a) | Net Sales to External Customers | | Percentage Change (a) |
|  | 2005 | 2004 |  | 2005 | 2004 |  |
| Pharmaceutical | $ 1,933 | $ 1,644 | 17.6 | $ 3,803 | $ 3,204 | 18.7 |
| Diagnostics (worldwide) | 957 | 848 | 12.9 | 1,844 | 1,607 | 14.8 |
| Ross | 589 | 520 | 13.3 | 1,266 | 1,186 | 6.8 |
| International | 1,769 | 1,521 | 16.3 | 3,521 | 3,025 | 16.4 |
| Total Reportable Segments | 5,248 | 4,533 | 15.8 | 10,434 | 9,022 | 15.7 |
| Other | 276 | 170 | 61.4 | 472 | 322 | 46.7 |
| Net Sales | $ 5,524 | $ 4,703 | 17.5 | $ 10,906 | $ 9,344 | 16.7 |
| Total U.S. | $ 3,018 | $ 2,593 | 16.4 | $ 5,980 | $ 5,181 | 15.4 |
| Total International | $ 2,506 | $ 2,110 | 18.8 | $ 4,926 | $ 4,163 | 18.3 |

a) Percentage changes are based on unrounded numbers.

Worldwide sales for the second quarter and six months 2005 reflect primarily unit growth and the positive effect of the relatively weaker U.S. dollar. The relatively weaker U.S. dollar increased second quarter and first six months 2005 consolidated net sales 2.3 percent and 2.5 percent respectively, and increased Total International sales 5.2 percent and 5.6 percent over the second quarter and first six months 2004. In addition, the effect of the relatively weaker U.S. dollar increased second quarter and first six months 2005 sales in the Diagnostic products segment by 3.8 percent and 4.0 percent, respectively, and International segment sales by 5.1 percent and 5.4 percent, respectively.

12

A comparison of the product group sales by segment for the six months ended June 30 is as follows: *(dollars in millions)*

|  | 2005 | Percentage Change (a) | 2004 | Percentage Change (a) |
|---|---:|---:|---:|---:|
| **Pharmaceutical —** |  |  |  |  |
| Primary Care | $ 2,267 | 24.2 | $ 1,825 | 25.9 |
| Specialty | 1,286 | 16.9 | 1,100 | 35.9 |
| **Diagnostics —** |  |  |  |  |
| Immunochemistry | 1,092 | 4.0 | 1,051 | 2.4 |
| Diabetes Care | 511 | 50.9 | 339 | 32.2 |
| **Ross —** |  |  |  |  |
| Pediatric Nutritionals | 552 | (3.6) | 573 | 10.3 |
| Adult Nutritionals | 541 | 27.4 | 425 | 11.8 |
| **International —** |  |  |  |  |
| Other Pharmaceuticals | 1,833 | 20.3 | 1,524 | 23.9 |
| Anti–Infectives | 476 | 9.2 | 436 | 6.1 |
| Hospital Pharmaceuticals | 325 | 13.2 | 287 | 15.9 |
| Pediatric Nutritionals | 329 | 15.3 | 286 | 13.4 |
| Adult Nutritionals | 349 | 11.0 | 314 | 13.8 |

a) Percentage changes are versus the prior year and are based on unrounded numbers.

Increased sales volume of *Mobic* in 2005 favorably impacted the Primary Care product sales of the Pharmaceutical products segment, and increased sales volume of *Humira* favorably impacted Specialty product sales in 2005 and 2004. Increased sales volume of *Humira* also favorably impacted Other Pharmaceuticals sales in the International segment. Worldwide sales of *Humira* totaled $603 million in the first six months 2005 and are forecasted to be more than $1.3 billion for the full year 2005. Diagnostics and International segment product sales were favorably impacted in 2005 and 2004 by the effect of the relatively weaker U.S. dollar. Diabetes Care product sales for the Diagnostic segment were favorably impacted by the acquisition of TheraSense in the second quarter of 2004. Adult Nutritionals product sales for the Ross products segment were favorably impacted by the acquisition of EAS in the fourth quarter of 2004 and Pediatric Nutritional product sales were unfavorably impacted in 2005 due to lower sales of *Similac*. U.S. sales of *Synthroid*, which is now subject to generic competition, were $237 million and $342 million in the first six months of 2005 and 2004, respectively.

The gross profit margin was 52.4 percent for the second quarter 2005, compared to 56.0 percent for the second quarter 2004. First six months 2005 gross profit margin was 52.7 percent, compared to 55.7 percent for the first six months 2004. The decrease in the gross profit margins was due to unfavorable product mix, primarily as a result of increased sales of Boehringer Ingelheim products that have lower margins than other products in the Pharmaceutical products segment, lower sales of *Synthroid* in 2005 as compared to 2004 and the unfavorable mix effect of exchange on the gross profit margins.

In July 2005, Abbott and Boehringer Ingelheim agreed to amend the terms of the agreement under which Abbott distributes certain Boehringer Ingelheim products. The amended terms will take effect on January 1, 2006. Abbott will no longer distribute, or record sales for the Boehringer Ingelheim products, but will co–promote one product, *Micardis,* through March 31, 2006, and will receive residual commissions on Boehringer Ingelheim's sales of the three products. The amount of pretax income under the revised arrangement will be the same as expected under the previous agreement. Net sales of Boehringer Ingelheim products for the first six months of 2005 were approximately $1.1 billion.

Research and development expenses increased 2.0 percent in the second quarter 2005 and 4.9 percent for the first six months 2005, respectively, over comparable 2004 periods. These increases were due, in part, to increased spending to support pipeline programs, including follow–on indications for *Humira*, and other late–stage clinical programs in pharmaceuticals, diabetes care and vascular devices. The majority of research and development expenditures are concentrated on pharmaceutical products.

13

Selling, general and administrative expenses for the second quarter and first six months 2005 increased 9.2 percent and 10.4 percent, respectively, over the comparable 2004 periods. These increases were due primarily to increased selling and marketing support for new and existing products, including continued spending for *Humira*, as well as spending on other marketed pharmaceutical products. These increases also reflect the effects of the acquisitions of TheraSense in the second quarter of 2004 and EAS in the fourth quarter of 2004.

In the second quarter 2004, Abbott reflected the requirements of Financial Accounting Standards Board Staff Position No. 106-2, "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003." The net cost recognized in the second quarter 2004 was reduced by approximately $16 million.

Future Restructurings

In July 2005, Abbott announced that it anticipated approval of several plans to realign its global manufacturing operations to reduce costs that involve reductions in staffing in several business segments, including selected international commercial operations. Implementation of these various plans is expected to result in after-tax charges in the second half of 2005 of approximately $215 million. Approval of the various plans is expected at different times. Approximately $200 million of these charges are projected to occur in the third quarter of 2005. As a result of product re-registration timelines required under manufacturing regulations in a number of countries, this manufacturing realignment will continue into 2006, when approximately $60 million in after-tax charges are expected.

Spin-off of Hospira

On April 12, 2004, Abbott's board of directors declared a special dividend distribution of all of the outstanding shares of common stock of Hospira, Inc. For every 10 Abbott common shares held at the close of business on April 22, 2004, Abbott shareholders received one share of Hospira stock on April 30, 2004. Hospira included the operations relating to the manufacture and sale of hospital products including specialty injectable pharmaceuticals, medication delivery systems and critical care devices and injectable pharmaceutical contract manufacturing. Hospira included Abbott's Hospital products segment, after that segment's reorganization on January 1, 2004, and portions of Abbott's International segment. The income and cash flows of Hospira and the direct transaction costs of the spin-off have been presented as discontinued operations in the Condensed Consolidated Statement of Earnings and Condensed Consolidated Statement of Cash Flows.

The legal transfer of certain operations and assets (net of liabilities) outside the United States is expected to occur in 2005 and 2006. Approximately half of these operations are expected to be transferred to Hospira in 2005 with the remaining operations transferring in the first half of 2006. As of June 30, 2005, approximately 20 percent of the operations have been transferred to Hospira. These operations and assets are used in the conduct of Hospira's international business and Hospira is subject to the risks and entitled to the benefits generated by these operations and assets. These assets and liabilities have been presented as held for sale in the Condensed Consolidated Balance Sheet. The assets and liabilities held for sale consist primarily of inventories, trade accounts receivable, equipment and trade accounts payable, salaries and other accruals.

Interest Expense

Net interest expense increased in both the second quarter and first six months of 2005 due to the impact of higher interest rates on debt levels, partially offset by higher interest income.

14

Taxes on Earnings

Taxes on earnings reflect the estimated annual effective rates and for the first six months 2005 include additional income taxes of approximately $52 million for remittances of foreign earnings of approximately $600 million in connection with the American Jobs Creation Act of 2004. In February 2005, management concluded that it would remit these earnings in 2005. Abbott is continuing to evaluate whether it will remit all or a portion of the remaining $3.6 billion available for remittance under the Act, and expects to decide later in the year. The effect of the increased income taxes on the remittance of foreign earnings was to increase the first six months 2005 effective tax rate by approximately 2.2 percentage points. 2004 includes the effects of charges for acquired in-process research and development. The effective tax rates, excluding the effect of the 2005 and 2004 items, are less than the statutory U.S. federal income tax rate principally due to the domestic dividend exclusion and the benefit of lower statutory tax rates and tax exemptions in several taxing jurisdictions.

Business Combinations and Technology Acquisitions

In April 2004, Abbott acquired TheraSense, Inc., a leader in the development, manufacturing and marketing of blood glucose self-monitoring systems, for approximately $1.2 billion in cash. Abbott also acquired certain other product technologies for approximately $352 million. These acquisitions resulted in a charge of $164 million for acquired in-process research and development, intangible assets of approximately $912 million, non-tax deductible goodwill of approximately $623 million and deferred income taxes of approximately $241 million. Acquired intangible assets, primarily product technology, are amortized over 9 to 17 years (average of approximately 13 years). In January 2004, Abbott acquired i-STAT Corporation, a manufacturer of point-of-care diagnostic products for blood analysis, for approximately $394 million in cash. In the first quarter of 2004, Abbott recorded a charge of approximately $60 million for acquired in-process research and development, intangible assets of approximately $263 million, non-tax deductible goodwill of approximately $109 million and deferred income taxes of approximately $105 million. Acquired intangible assets, primarily product technology, are amortized over 7 to 18 years (average of approximately 17 years). Had these acquisitions taken place on January 1 of the previous year, consolidated sales and income would not have been significantly different from reported amounts.

Liquidity and Capital Resources at June 30, 2005 Compared with December 31, 2004

Net cash from operating activities of continuing operations for the first six months 2005 totaled $2.3 billion. Abbott expects annual cash flow from operating activities to continue to exceed Abbott's capital expenditures and cash dividends. The decrease in cash from operating activities of approximately $246 million compared to 2004 was due primarily to a $641 million contribution to Abbott's main domestic defined benefit plan and a $140 million contribution to the post-employment medical and dental benefit plans. These amounts are included in Other, net in the Condensed Consolidated Statement of Cash Flows.

At June 30, 2005, Abbott had working capital of approximately $3.6 billion compared to working capital of approximately $3.9 billion at December 31, 2004.

At June 30, 2005, Abbott's long-term debt rating was AA by Standard & Poor's Corporation and A1 by Moody's Investors Service. Abbott has readily available financial resources, including unused lines of credit of $3.0 billion, which support commercial paper borrowing arrangements.

In October 2004, the board of directors authorized the purchase of 50 million shares of Abbott's common stock from time to time and no shares were purchased under this authorization in 2004. During the six months ended June 30, 2005, Abbott purchased approximately 13.2 million of its common shares under this authorization at a cost of approximately $602 million. In the six months ended June 30, 2004, Abbott purchased approximately 6.9 million of its common shares at a cost of approximately $297 million under a prior authorization.

Under a registration statement filed with the Securities and Exchange Commission in September 2003, Abbott issued $1.5 billion of long-term debt in the first quarter of 2004 that matures in 2009 through 2014 with interest rates ranging from 3.5 percent to 4.35 percent. Proceeds from this debt were used to fund the acquisition of TheraSense in the second quarter of 2004 and to pay down domestic commercial paper borrowings.

Recently Issued Accounting Standards

In May 2005, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards (SFAS) No. 154, "Accounting Changes and Error Corrections." This statement generally requires retrospective application to prior periods' financial statements of voluntary changes in accounting principles. Under the prior rules, changes in accounting principles were generally recognized by including in net income of the period of the change the cumulative effect of changing to the new accounting principle. This statement does not change the previous guidance for reporting the correction of an error in previously issued financial statements, change in accounting estimate or justification of a change in accounting principle on the basis of preferability. This statement is effective for accounting changes made in fiscal years beginning after December 15, 2005. Adoption of the provisions of the Statement is not expected to have a material affect on the results of operations or financial position of Abbott.

In December 2004, the Financial Accounting Standards Board issued a revised Statement of Financial Accounting Standards (SFAS) No. 123 (revised 2004), "Share-Based Payment." This standard required companies to expense employee stock options beginning no later than July 1, 2005. On April 14, 2005, the Securities and Exchange Commission announced that companies may implement SFAS No. 123 (revised 2004) at the beginning of their next fiscal year that begins after June 15, 2005. Abbott expects to adopt the revised rules on January 1, 2006. Abbott expects that stock compensation expense under the rules would reduce reported diluted earnings per share by approximately 14 cents in 2005. The effect of adopting the new standard on diluted earnings per share in future periods is dependent on the number of options granted in the future, the terms of those awards and their fair values.

Legislative Issues

Abbott's primary markets are highly competitive and subject to substantial government regulation. Abbott expects debate to continue at both the federal and the state levels over the availability, method of delivery, and payment for health care products and services. Abbott believes that if legislation is enacted, it could have the effect of reducing prices, or reducing the rate of price increases for health care products and services. International operations are also subject to a significant degree of government regulation. It is not possible to predict the extent to which Abbott or the health care industry in general might be adversely affected by these factors in the future. A more complete discussion of these factors is contained in Item 1, Business, in the Annual Report on Form 10-K, which is available upon request.

Private Securities Litigation Reform Act of 1995 — A Caution Concerning Forward-Looking Statements

Under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, Abbott cautions investors that any forward-looking statements or projections made by Abbott, including those made in this document, are subject to risks and uncertainties that may cause actual results to differ materially from those projected. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarter ended March 31, 2005.

PART I. FINANCIAL INFORMATION

<u>Item 4. Controls and Procedures</u>

(a) *Evaluation of disclosure controls and procedures.* The Chief Executive Officer, Miles D. White, and Chief Financial Officer, Thomas C. Freyman, evaluated the effectiveness of Abbott Laboratories' disclosure controls and procedures as of the end of the period covered by this report, and concluded that Abbott Laboratories' disclosure controls and procedures were effective to ensure that information Abbott is required to disclose in the reports that it files or submits with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and to ensure that information required to be disclosed by Abbott in the reports that it files or submits under the Exchange Act is accumulated and communicated to Abbott's management, including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(b) *Changes in internal control over financial reporting.* During the quarter ended June 30, 2005, there were no changes in Abbott's internal control over financial reporting (as defined in Rule 13a–15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, Abbott's internal control over financial reporting.

17

PART II. OTHER INFORMATION

Item 1.    Legal Proceedings

Abbott is involved in various claims, legal proceedings and investigations, including (as of June 30, 2005, except as otherwise indicated) those described below.

In its 2004 Form 10-K, Abbott reported that a number of prescription pharmaceutical pricing antitrust suits were brought in the mid-1990s on behalf of retail pharmacies in federal and state courts as purported class actions. The retail pharmacies alleged that pharmaceutical manufacturers, including Abbott, conspired to fix prices for prescription pharmaceuticals and/or to discriminate in pricing to retail pharmacies in violation of state and federal antitrust laws. As previously disclosed, Abbott has settled all of the claims, with the exception of the claims brought on behalf of a group of retail pharmacies that "opted-out" of the class action settlement. Abbott has agreed to pay $2.3 million to these opt-out plaintiffs to settle their Sherman Act claims. These plaintiffs' Robinson-Patman claims are pending in the United States District Court for the Eastern District of New York.

In its Form 10-Q for the first quarter of 2005, Abbott reported that cases are pending in which Abbott seeks to protect its patents for divalproex sodium, a drug that Abbott sells under the trademark Depakote®. During the second quarter, TorPharm did not appeal the court of appeals' decision affirming the infringement finding by the lower court. In June 2005, Abbott filed a patent infringement lawsuit in the United States District Court for the Northern District of Illinois against Nu-Pharm Inc.'s proposed generic version of Depakote DR seeking injunctive relief.

In its Form 10-Q for the first quarter of 2005, Abbott reported that it had reached a preliminary settlement with a class of indirect purchasers (including the Attorneys General of the States of Colorado, Florida and Kansas) relating to Abbott's settlement of patent litigation involving terazosin hydrochloride, a drug sold by Abbott under the trademark Hytrin®. On June 29, 2005, the United States District Court for the Southern District of Florida gave its final approval to that settlement. Abbott has now settled with the majority of the plaintiffs in the aggregate amount of $90 million, which was previously reserved. The claims of the remaining two plaintiffs groups are not material and are reserved for by Abbott.

In its Form 10-Q for the first quarter of 2005, Abbott reported that a number of cases, brought as purported class actions or representative actions, are pending that allege generally that Abbott and numerous other pharmaceutical companies reported false pricing information in connection with certain drugs that are reimbursable under Medicare and Medicaid. These cases brought by private plaintiffs, state counties and State Attorneys General generally seek damages, treble damages, disgorgement of profits, restitution and attorneys' fees. The federal court cases have been consolidated in the United States District

18

Court for the District of Massachusetts as *In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL 1456*. During the second quarter, twenty-two New York counties filed lawsuits in federal courts in New York that have been or will be transferred to MDL 1456. These twenty-two New York counties along with nine other previously disclosed New York counties filed a master consolidated complaint. In addition to the previously disclosed investigations, the Texas Attorney General is investigating Abbott's marketing and pricing practices with respect to certain reimbursable pharmaceutical products, and the Department of Justice is contemplating a civil proceeding against an unspecified number of other pharmaceutical companies and Abbott in connection with its investigation, which is more fully discussed in Abbott's 2004 Form 10-K.

In its 2004 Form 10-K, Abbott reported that the court in *In re: Lupron® Marketing and Sales Practices Litigation, MDL 1430*, had granted preliminary approval for a proposed nationwide settlement of litigation involving allegations that TAP Pharmaceutical Products Inc. (TAP) reported false pricing information in connection with Lupron®. On May 12, 2005, the United States District Court for the District of Massachusetts gave its final approval to that settlement, under which TAP will pay $150 million. Additionally, the claims of most of the plaintiffs who sought to be excluded from the nationwide settlement were also settled, with TAP paying no more than an additional $12.24 million.

In its Form 10-Q for the first quarter of 2005, Abbott reported that six cases were pending in which Abbott sought to protect the patents covering fenofibrate, a drug Abbott sells under the trademark TriCor®. During the second quarter, all of these cases, other than *Reliant*, were resolved through mutual releases, except for counterclaims by two parties, Teva and Impax. Additionally, Abbott paid approximately $1.75 million in costs.

During the second quarter, ten lawsuits, including nine purported class actions, were filed against Abbott, Fournier Industrie et Sante, and Laboratoires Fournier, S.A. (Fournier) in the United States District Court for the District of Delaware alleging antitrust and unfair competition claims in connection with the sale of fenofibrate formulations. The nine purported class actions are: *Allied Services Division Welfare Fund and Hector Valdes*, filed in June 2005; *Diana Kim on behalf of herself and others similarly situated*, filed in June 2005; *Louisiana Wholesale Drug Company, Inc.*, filed in May 2005; *Meijer, Inc. and Meijer Distribution, Inc.*, filed in June 2005; *Painters District Council No. 30 Health and Welfare Fund and Richard G. Wilde*, filed in June 2005; *Pennsylvania Employees Benefit Trust Fund*, filed in June 2005; *Elaine M. Pullman, Neil Perlmutter, Helena Perlmutter and Lula Ramsey*, filed in June 2005; *Rochester Drug Co-Operative, Inc.*, filed in June 2005; and *Vista Healthplan, Inc. and Ross Love*, filed in June 2005. The individual lawsuit is: *Walgreen Co.; Eckerd Corporation; The Kroger Co.; and Maxi Drug, Inc.*, filed in June 2005. These cases seek actual damages, treble damages and other relief.

In its Form 10-Q for the first quarter of 2005, Abbott reported that it is a defendant in numerous lawsuits involving the drug oxycodone, a drug manufactured and sold by Purdue Pharma under the trademark OxyContin®. Abbott promoted OxyContin to certain specialty

19